## In re HARDY.

### (District Court, S. D. Georgia. February 23, 1916.)

BANKRUPTCY ⟲399(3)—EXEMPTIONS—LOSS BY CONCEALMENT OF ASSETS.

The Constitution of Georgia allows to the head of a family an exemption of property to the value of $1,600. Code Ga. 1910, § 3380, provides that every person claiming such exemption must make a full disclosure of all personal property of which he may be possessed; that if personal property is fraudulently concealed no exemption shall be made in his favor until it is delivered up, and that a debtor guilty of willful fraud shall lose the exemption. A bankrupt, after verifying his schedules, returned to his store and took from the safe and cash drawer checks which he had not scheduled, and distributed the amounts thereof among his most pressing creditors, most of the payments being made after adjudication entered. He also turned over to his brother, to whom he was indebted, fresh meat on hand when he closed the store, claiming that he feared it would spoil, and permitted his wife to spend for necessaries checks aggregating a few dollars. He never offered to account for any of the money or other property so kept back, or to surrender it to the trustee. *Held*, that he violated, not only the state statute, but the Bankruptcy Act, and it was the duty of the court to deny him his exemption.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 657, 669; Dec. Dig. ⟲399(3).]

In Bankruptcy. In the matter of Frank T. Hardy, bankrupt. On petition for review of an order of the referee denying a homestead exemption to the bankrupt. Petition overruled, and exemption denied.

Bennet & Harrell, of Quitman, Ga., for bankrupt.

Branch & Snow and M. Baum, all of Quitman, Ga., for trustee and objecting creditors.

LAMBDIN, District Judge. Frank T. Hardy, the bankrupt, on February 17, 1915, verified his petition and schedules in voluntary bankruptcy, and same were filed and an order of adjudication entered therein on February 19th. The bankrupt in his schedules claimed as exempt the stock of goods, fixtures, and furniture and the notes and accounts due him in his business, which was that of retail grocer in Quitman, Ga. The trustee set apart said property as exempt, and thereupon the trustee and certain of his creditors filed their objections to the allowance of the exemption on the ground that the bankrupt had been guilty of willful fraud in the concealment of a part of his property from his creditors, giving specifications of the same. The referee heard these objections, and sustained same, and denied the exemption, and the bankrupt filed his petition to review this order of the referee, and that is the question now before me for decision.

1. Under Bankr. Act July 1, 1898, c. 541, § 6, 30 Stat. 548 (Comp. St. 1913, § 9590), the exemption to be allowed the bankrupt in this case is governed by the laws of the state of Georgia. The Constitution of the state allows to a head of a family an exemption of property to the value of $1,600. Section 3380 of the Code of Georgia of 1910, which is applicable to this constitutional exemption, omitting the immaterial portions, is in the following language:

"Sec. 3380. *Schedule Must be Full; Effect of Fraudulent Omission.* It shall be the duty of each and every person who claims the benefit of the exemption allowed in this article, as the allowance is a liberal one, to act in perfect good faith; and as it is in the power of the debtor, claiming the exemption of personal property, to conceal part of his property or money, and to claim the balance as exempt, it shall be the duty of such debtor, when he takes steps in the court of ordinary to have said exemption of personal property set off to him, to make a full and fair disclosure of all the personal property, including money, stocks, and bonds, of which he may be possessed at the time, * * * and if the money or other personal property of which he is possessed at the time of his said application, or at the time he obtains the order of court setting off the property exempt, is fraudulently concealed, or is not delivered up for the benefit of his creditors, no exemption shall be made in his favor till it is so delivered up; and all orders of court obtained by the fraudulent concealment of property as aforesaid, or obtained while the debtor had personal property, money, stocks, or bonds which he kept out of the reach of the levying officer, or did not in good faith deliver up for the benefit of his creditors, shall be null and void and of no effect. * * * The debtor guilty of willful fraud in the concealment of part of his property from his creditors, of which he is possessed when he seeks the benefit of the exemption, shall, on account of his fraud, lose the benefit of such exemption, and his property shall be subject to the payment of all just debts which he owed at the time such fraud was committed."

In order, therefore, to determine the question whether the bankrupt should be allowed his exemption or not, it is necessary to ascertain whether the bankrupt made a full and fair disclosure of all his personal property, or was guilty of willful fraud in the concealment of a part of his property from his creditors, as set out in the section of the Code above quoted.

The trustee and objecting creditors, in their objections which they filed to the allowance of the exemption, set out 13 specifications of money, checks, and other personal property, which they claim that the bankrupt did not set out in his schedules, but willfully and fraudulently concealed from his creditors—some of same being as follows: (1) Checks amounting to $104.40 collected from one W. J. McDonald by bankrupt; * * * (3) the sum of $60.64, same being represented by cash and checks held by bankrupt when he filed his petition in bankruptcy; (4) a large amount of fresh meat then owned by him; * * * (10) a large amount of mill checks issued by the Interstate Lumber Company to its employés, which had been taken in by the bankrupt in the conduct of his business and were held by him when he filed his schedules. None of these items of checks, cash, and other articles were set out by the bankrupt in his schedules, which he swore to and filed in court.

It is the opinion of the court that the objectors failed to sustain their objections as to the other items not enumerated above, and therefore it is not necessary to set out same in this opinion. However, the court has carefully read and reread the evidence in the case, and is of the opinion that the first, third, fourth, and tenth specifications, which are set out above, are amply sustained by the evidence.

2. In the answer which the bankrupt filed to the above-mentioned specifications, he admitted receiving two checks, which were given to him by W. J. McDonald, amounting to $104.40, and also admitted taking in cash and checks from his cash drawer the sum of about

$40.19, making a total of $144.59; but he claimed that he paid all this money out to his creditors, and he gave the names and amounts which he paid to each, as follows: $71.40 to his brother, J. J. Hardy; $17 to his clerk, J. A. Prosser; $6 to his bookkeeper, W. T. Bush; $25 to his wife; $5.65 to Dr. Parks, and $5 to Dr. Donaldson; and some amounts paid as insurance. He also stated in his answer that he discovered these McDonald checks and this money in his safe and cash drawer after he had prepared and filed his schedules in bankruptcy. He also admitted that he had on hand a small amount of fresh meat when he closed his store, but said that, knowing that same would not keep until his trustee was elected, he turned it over to his brother, J. J. Hardy, to whom he was largely indebted at the time. He admitted also in his answer that he had $3.15 worth of lumber mill checks on hand when he closed his business, and said that his wife spent same for necessaries. He also averred in his answer, in conclusion, that he had surrendered all his property and money to his creditors, and had kept nothing for himself and his family, and that they were in destitute circumstances. He attached a pauper affidavit to his petition in bankruptcy, in which he stated that he was without and could not obtain money with which to pay the filing fees.

The evidence before the referee showed that the bankrupt prepared and verified his schedules about 7 or 8 o'clock on the night of February 17th, and then went back to his store and took from the safe the two McDonald checks, amounting to $104.40 as aforesaid, and also took from the safe and cash drawer about $40.19 in cash and small checks. The bankrupt testified that he did not know that the McDonald checks were in the safe until after he verified his schedules. Still he had directed his bookkeeper on the 16th to get these checks from McDonald, and the bookkeeper placed them in the safe on that day. He must therefore have known of the existence of these checks; at any rate, it was his duty to ascertain what checks, money, and other property he had on hand, and to make a true statement of same in his schedules. After getting this money and these checks, the bankrupt did not go back to his attorneys and amend his schedules, as he should have done, but kept the same and proceeded to distribute same among his most pressing creditors. His petition and schedules did not reach the office of the clerk of this court until the morning of February 19th; but the bankrupt, according to the evidence, was ignorant of this delay in the mails.

It is clear from the evidence that most, if not all, of this money and these checks was paid out after the petition was filed and the adjudication entered. The largest amount, $71.40, was paid to his brother, J. J. Hardy, who testified that he kept after his brother until he got the money. He also testified that this amount was paid him in three payments, and that the last payment consisted of one of the checks of W. J. McDonald, which amounted to $54.40. The bankrupt testified that he paid his brother one or two days after he went into bankruptcy. He paid Dr. Parks $5.65 on March 22d, and Dr. Donaldson $5 two or three weeks after he went into bankruptcy. J. J. Hardy further testified that it was not until after he prepared his proof of

claim against the bankrupt that he had a final settlement of his account with the bankrupt; but he said that full settlement was made before March 1st, which was the date of the first meeting of the creditors. At this first meeting of the creditors the proof of the debt of J. J. Hardy against the bankrupt was read out for the full amount in the hearing of the bankrupt, and the bankrupt made no objection to the allowance of same. The fresh meat, which the bankrupt feared would spoil, was turned over to J. J. Hardy on his account a day or two after F. T. Hardy went into bankruptcy. In his testimony at a meeting of the creditors held on March 19th, the bankrupt admitted that he had $2.30 of the mill checks above mentioned at home on the mantel at the time. The bankrupt never offered to account for any of the money or other property so kept back by him, or to surrender same to the trustee. These were all trust funds belonging to his creditors, and the bankrupt should have kept same intact, and surrendered same to his trustee.

From the foregoing evidence, the court is constrained to uphold the referee in his decision, and to decide that the bankrupt did not make a full and fair disclosure of all his personal property, as required by law, but that he was guilty of willful fraud in concealing the checks, money, and other articles above mentioned. It is clear that he withheld this property from his trustee willfully and with intent to defraud his creditors. The proven facts are utterly inconsistent with ignorance or an innocent intent on his part. Such being the case, it is the duty of the court to enforce the Georgia statute on the subject and to deny the bankrupt his exemption. The destitute condition of the bankrupt and his family appeals to the sympathy of the court, yet his violation of not only the Georgia statute, but the provisions of the Bankruptcy Act itself, is so clear and palpable that the court cannot consult its feelings in the matter. The bankrupt yielded to the temptation to save something from the wreck so as to meet the necessities of his family, and in doing so he sacrificed his claim to his exemption. By unlawfully withholding and concealing $150, he lost the exemption of $1,600, which would otherwise have been allowed him. This is a forcible illustration of the old maxim that "honesty is the best policy."

It is not necessary to cite any decisions on this question, but it may be proper for the court to refer to the very thorough opinion rendered by Judge Newman, of the Northern District, on the same subject, in Re Cochran (D. C.) 185 Fed. 913. In the case of Torrance v. Boyd, 63 Ga. 22, the debtor failed to schedule articles of personal property amounting in value only to $17.50, and yet his exemption was denied him on account of this concealment. In the case of McNally v. Mulherin & Co. et al., 79 Ga. 614, 4 S. E. 332, the second headnote is in the following language:

"A debtor who applies for an exemption of personalty must make a full and fair disclosure of all his property. He cannot retain any amount of money which he may deem necessary and needful to employ attorneys, pay licenses and carry on business, but he must account for it; and if the schedule exceeds the amount to which he is entitled as an exemption, he must produce the money in court, and pay it over so that his creditors may get it."

The second headnote in the case of McWilliams v. Bones, Trustee, 84 Ga. 199, 10 S. E. 723, which is appropriate here, is as follows:

"The sale by the applicant, after making his application, of an iron safe which he had placed on his schedule, was sufficient to have defeated the application, unless he accounted for the money the safe brought, and delivered up the same for the benefit of his creditors."

The bankrupt has nobody to blame but himself. No matter how great were the necessities of himself and family, he should have acted honestly and fairly with his creditors and with the court, and if he had done so he would not have lost his exemption. Not only did he violate the Georgia statute on the subject, but he also apparently violated the provisions of section 29 of the Bankruptcy Act (Comp. St. 1913, § 9613) in making the pauper affidavit to his petition in bankruptcy, and in concealing while a bankrupt from his trustee the above-mentioned property belonging to his estate. His brother also apparently violated the provisions of the same section of the Bankruptcy Act in receiving payment of his debt of $71.40 against the bankrupt after he knew that his brother had gone into bankruptcy.

3. The referee did not commit any error in the other matters urged in the petition for review.

The court, therefore, has no other alternative but to overrule the petition to review the order of the referee and to deny the exemption asked for.

An order will be entered accordingly.